IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


IPSL, LLC,                                              No. 3:18-cv-01885-HZ

                        Plaintiff,                     OPINION & ORDER

        v.

COLLEGE OF MOUNT SAINT VINCENT,

                Defendant.


Paul W. Newton
HAWTHORNE LAW
1708 SE 45th Avenue
Portland, OR 97215

        Attorney for Plaintiff

James G. Parker
Ashlee Marie Aguiar
DAVIS WRIGHT TREMAINE, LLP
1300 SW 5th Avenue, Suite 2400
Portland, OR 97201

        Attorneys for Defendant

HERNÁNDEZ, District Judge:

Plaintiff IPSL, LLC, brings this case for breach of contract, conversion, defamation, and tortious interference against Defendant College of Mount Saint Vincent.[1] Defendant now moves to dismiss this action for lack of personal jurisdiction or, in the alternative, transfer this case to the Southern District of New York. Because this Court lacks personal jurisdiction over Defendant, the Court grants Defendant's motion to dismiss.

## BACKGROUND

Plaintiff IPSL is a social benefit corporation located in Portland, OR. Notice of Removal Ex. 2 ("Compl.") ¶ 1, ECF 1. Plaintiff "owns, operates and contracts with various international sites for the benefit of college level student service-learning, 'advocacy research' and study abroad." *Id.* at ¶ 3. To the extent that Plaintiff's employees or contractors are at other sites in the United States and abroad, they are controlled, supervised, and trained by personnel in Portland. Morgan Decl. ¶ 3, ECF 13.

Defendant College of Mount Saint Vincent ("CMSV") is a non-profit liberal arts college located in New York. Compl. ¶ 2; Def. Mot. Dismiss 2, ECF 9. It was formed in New York in 1847 and has operated exclusively in New York since its founding. CMSV Decl. ¶ 2, ECF 9-1.

The parties' relationship began in 2010. That year, Dr. Omar Nagi, Defendant's Director of International Programing, heard Dr. Kalyan Ray, an IPSL program director who lived and taught in Kolkata, India, speak at a conference in India. Morgan Decl. ¶ 8. Dr. Nagi invited Dr. Ray to speak at CMSV on "education as a tool for social justice." Second Nagi Decl. ¶ 4, ECF

---

[1] The complaint also asserted claims against Individual Defendants Omar Nagi, Donna Jacklosky, Sarah Stevenson, Kristin Lawler, and Mitchell Sakofs. In the present motion, Defendant moved to dismiss the claims against four of the five Individual Defendants for improper service. On February 22, 2019, Plaintiff filed an Unopposed Notice of Voluntarily Dismissal of the Individual Defendants pursuant to Fed. R. Civ. P. 41(a)(1). ECF 30. Accordingly, they are no longer parties to this action, and Defendant's motion to dismiss for improper service is moot.

28-2. He suggested that Dr. Ray meet with the college's president and provost during his visit. Morgan Decl. Ex. A. Although Dr. Nagi does not recall knowing of IPSL or of Dr. Ray's connection to IPSL at the time, Thomas Morgan—the President of IPSL—states that Dr. Nagi sought to discuss the possibility of an IPSL program at CMSV during Dr. Ray's visit. *Compare* Second Nagi Decl. ¶ 4 *with* Morgan Decl. ¶ 8. However, in a March 2011 email organizing Dr. Ray's talk, Dr. Ray had to clarify that he was "not affiliated to Loreto College" but instead directed the IPSL program that had long been affiliated with Loreto College. Morgan Decl. Ex. A. Dr. Nagi declares that this was the first time he was advised of Dr. Ray's affiliation with IPSL. Second Nagi Decl. ¶4. Dr. Ray ultimately spoke at CMSV in April of 2011. Morgan Decl. Ex. A.

Shortly thereafter, Mr. Morgan reached out to Dr. Nagi via email. First Nagi Decl. Ex. A, ECF 9-6. Per this email, Mr. Morgan had been in contact with Dr. Ray about Dr. Ray's recent visit to CMSV. *Id.* He wrote that, "[a]s a follow up to Dr. Ray's visit, IPSL would be thrilled to include [Dr. Nagi] and [CMSV] in our community of international service-learning." *Id.* He suggested an in-person meeting in New York with Dr. Nagi and others to "explor[e] program opportunities for [CMSV's] students and faculty." *Id.* Mr. Morgan declares that he only reached out to Dr. Nagi after he "learned of CMSV's interest and possible Mission-alignment with IPSL programming." Morgan Decl. ¶ 8.

In July of 2013, Plaintiff flew Dr. Nagi from New York to Portland. First Nagi Decl. ¶ 12. It paid for his flight and accommodations. *Id.* In January of 2015, Mr. Morgan invited Dr. Nagi to stay at his home in Portland. *Id*. Mr. Morgan claims that during both visits Dr. Nagi worked from the IPSL offices, met with staff regarding the parties' partnership operations and

details of the program, and conducted mutual business and program development. Morgan Decl. ¶ 11.

In the fall of 2013, the parties began working together to prepare an application for the New York State Educational Department for a new master's program in International Development and Service ("IDS Program"). CMSV Decl. ¶ 5. The IDS Program was approved by the state in early 2014 and began its inaugural academic year in the fall of 2014. *Id.* at ¶ 6. Plaintiff alleges that this graduate program resulted in extra administrative duties for Plaintiff's staff that Defendant was supposed to manage, which strained the parties' relationship. Morgan Decl. ¶ 10.

During this time, Plaintiff also began leasing an apartment in Manhattan for IPSL team members who were in New York for work. Second Nagi Decl. Ex. B. The apartment was also listed on Airbnb, and Dr. Nagi and others associated with CMSV occasionally used the apartment. Morgan Decl. ¶ 15.

Defendant provided Plaintiff with free office space on its campus. Morgan Decl. ¶ 9; Second Nagi Decl. Ex. B. The office was used for operations related to Plaintiff's partnership with Defendant and to recruit students from a number of other East Coast schools. Morgan Decl. ¶ 9. IPSL maintained one or two office staff in this location. *Id.* at ¶ 9; Second Nagi Decl. Ex. A. In several documents and emails, Plaintiff referred to this office as its "East Coast headquarters." Second Nagi Dec. Ex. B ("IPSL was very fortunate to be invited to partner with CMSV, and their offer to host our East Coast headquarters, gratis, was very gracious."); *id.* at Ex. C ("We were invited by the college president, Chuck Flynn, as part of the college's internalization efforts, to create an East Coast headquarters. We jumped at the chance, as so much of our recruitment efforts remain with institutions located in the East."); *id.* at Ex. D, ECF 35 (2016

Memorandum of Understanding regarding activities between Plaintiff and Defendant that Defendant would provide free office space "for IPSL to operate IPSL's East Coast headquarters").

In 2014, Dr. Nagi also reached out to two individuals who were participating in IPSL's program in Portland. Morgan Decl. Exs. C, D. In one email, Dr. Nagi contrasted the New York program with the Portland program in order to try to "persuade [the student] to consider the NY based IPSL program." *Id.* at Ex. C. Plaintiff also provides another email where Dr. Nagi and Mr. Morgan discuss a second student, who Mr. Morgan indicates was attending an Oregon school. *Id.* at ¶ 13. Mr. Morgan suggests that the student was "specifically solicited by Dr. Nagi to consider transferring from an Oregon program to the program at CMSV." *Id.* Ultimately, several students from Oregon participated in IPSL programs through Defendant. Newton Decl. ¶ 6, ECF 14; Second Stevenson Decl. ¶ 3, ECF 28-1. In addition, Defendant posted a link to Plaintiff's website on its website. Oringdulph Decl. ¶ 3, Ex. A, ECF 15.

Around July 20, 2015, the parties entered into a memorandum of understanding (the "2015 Agreement") to "cooperate in CMSV's offering of an international master's program of study" and "leverage IPSL's international and domestic networks for the purposes of developing this and other international and domestic programs." Morgan Decl. Ex. B. The agreement's duration was five years from the date of its execution. *Id.* at 1. Under the agreement, Defendant was to—among other things—provide a Master of Science Degree in International Development; work closely with Plaintiff to recruit qualified candidates through its own on-campus and partner campus networks; bill students and remit a certain portion of the funds to Plaintiff; comply with various internal CMSV procedures; identify faculty to oversee the program; secure limited housing for students; and create and support strategic partnerships that would "serve as pipelines

for the IDS graduate program." *Id.* at 2. Plaintiff, in turn, was to take "primary responsibility for all pre-admission processing," including advertising and recruiting. *Id.* at 3. Plaintiff was also tasked with negotiating program fees with partners; working with overseas institutions to provide program related logistics; and "exercise[ing] primary administrative responsibility for the selection and maintenance of study abroad program sites." *Id.* The agreement provided that the "current and incoming (Fall 2015) cohort Concordia University-Portland students [could] transfer to CMSV, should they choose to do so, starting Fall 2015 with full credit awarded toward their final CMSV/IPSL MS degree." *Id.* at 2.

In 2016, the parties entered into another memorandum of understanding ("2016 Agreement") to collaborate in offering undergraduate study abroad and service-learning programs. Second Nagi Decl. Ex. D. Under that agreement, Plaintiff was responsible for recruiting and admitting qualified students; serving as a study abroad advising center on the CMSV campus; hiring and supervising staff to work at Plaintiff's office on the CMSV campus; offering internship and fellowship opportunities at its CMSV office; and performing various administrative duties pertaining to the international program sites. *Id.* at 1–2. Defendant was to assist in recruiting CMSV undergraduate students and undergraduate students in Defendant's networks; provide IPSL office space and support IPSL staff; ensure that CMSV students could obtain academic credit for IPSL programs; and perform other CMSV-orientated administrative duties. *Id.* at 2–3. Both were required to develop a co-branded identity ("IPSL at College of Mount Saint Vincent") to, among other things, develop and retain programs with other service-oriented institutions. *Id.*

In January of 2017, Mr. Morgan complained to CMSV President Chuck Flynn that CMSV staff were not providing the services agreed upon under their 2015 Agreement. Morgan

Decl. ¶ 10. In turn, President Flynn requested a detailed accounting of the costs of services rendered by Plaintiff. *Id.* Plaintiff's costs amounted to just over $50,000 but were not paid by Defendant. *Id.*

In May of 2017, Defendant terminated the 2015 Agreement and proposed a severance agreement whereby Defendant would assume control of IPSL functions. Compl. ¶ 8. Defendant claims that their relationship deteriorated when Plaintiff began asking for unsubstantiated amounts of money not contemplated by the parties and steering students to IPSL-owned sites rather than accredited universities for academic credit. CMSV Decl. ¶ 7.

In June of 2017, Plaintiff alleges that Defendant proffered a new termination agreement to ensure stability for the parties, the students, and the IDS Program. Compl. at ¶ 11. The termination agreement required both parties to continue their obligations per the 2015 Agreement through January 31, 2018. *Id.* ¶ 12. Defendant had to pay Plaintiff according to their prior agreement, Plaintiff had to provide training to Defendant on its process and procedure, and the parties had to abide by a non-disparagement clause. *Id.* In July of 2017, the parties entered into the termination agreement. *Id.*; CMSV Decl. ¶ 8.

In the Fall of 2017, Plaintiff alleges that Dr. Nagi breached the termination agreement by "setting new requirements" for Plaintiff or by cancelling its services. Compl. ¶ 13.  For example, Dr. Nagi is alleged to have cancelled Plaintiff's participation in Defendant's new student orientation, changed visa workshops and information sessions, and assumed visa preparation functions. *Id.* at ¶¶ 14–16. Dr. Nagi is also alleged to have disparaged Defendant by "innuendo and suggestion." *Id.* at ¶¶ 14, 19. He allegedly accused Plaintiff of misleading students about grades and disparaged Plaintiff in regard to student safety. *Id.* at ¶ 22.  Defendant also demanded

information about Plaintiff's overseas sites and relationships and contacted IPSL sites directly. *Id.* at ¶¶ 20, 24.

Due to these alleged breaches, the parties amended the termination agreement to allow Defendant to assume pre-departure logistics. *Id.* at ¶ 28. But on December 11, 2017, Defendant refused to pay for Plaintiff's services rendered. *Id.* at ¶ 6. The parties' relationship formally ended in January of 2018. CMSV Decl. ¶ 8.

Plaintiff filed this action in state court on September 24, 2018, seeking $480,000 in damages for breach of contract, conversion, defamation, and tortious interference. Compl. at 5–7. Specifically, Plaintiff alleges that Defendant breached the 2015 Agreement by requiring Plaintiff to abide by a termination agreement that did not comply with the terms of the 2015 Agreement. Compl. at 5. Plaintiff also alleges that Defendant breached the termination agreement by modifying and changing the respective roles of Plaintiff and Defendant under the terms of that agreement. Compl. at 5. Plaintiff contends that Defendant converted to its own use the property of IPSL, including its programmatic content and terminology related to the IDS Program; contact information and site information of IPSL's overseas sites and contractors; orientation and pre-departure information; and visa workshops and visa requirements. *Id.* Plaintiff contends that Defendant defamed Plaintiff in three separate statements made to "students" and "others" in November of 2017 regarding IPSL's safety protocols and alleged preference for its own IPSL-owned study abroad sites. *Id.* at 5–6. Finally, Plaintiff alleges that Defendant tortiously interfered with its business by demanding Plaintiff's business information and operational details; eliminating the spring of 2018 study abroad options; requesting information from students about study abroad logistics; and changing the services rendered by Plaintiff to CMSV students by preventing Plaintiff from delivering on its promised programs. *Id.*

Defendants removed the case to federal court on October 26, 2018, Notice of Removal, ECF 1, and subsequently moved to dismiss this case for lack of personal jurisdiction and improper service or, in the alternative, transfer this case to the Southern District of New York, Def. Mot. Dismiss, ECF 9.

## STANDARDS

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move for dismissal on the grounds that the court lacks personal jurisdiction. Plaintiff has the burden of showing personal jurisdiction. *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008).

> If the district court decides the motion without an evidentiary hearing, which is the case here, then the plaintiff need only make a prima facie showing of the jurisdictional facts. Absent an evidentiary hearing this court only inquires into whether the plaintiff's pleadings and affidavits make a prima facie showing of personal jurisdiction. Uncontroverted allegations in the plaintiff's complaint must be taken as true. Conflicts between the parties over statements contained in affidavits must be resolved in the plaintiff's favor.

*Id.* (citations, internal quotation marks, and brackets omitted).

In diversity cases, the court looks to the law of the state in which it sits to determine whether it has personal jurisdiction over the non-resident defendant. *W. Helicopters, Inc. v. Rogerson Aircraft Corp.*, 715 F. Supp. 1486, 1489 (D. Or. 1989); *see also Boschetto*, 539 F.3d at 1015 ("When no federal statute governs personal jurisdiction, the district court applies the law of the forum state.").

Oregon Rule of Civil Procedure (ORCP) 4 governs personal jurisdiction issues in Oregon. Because Oregon's long-arm statute confers jurisdiction to the extent permitted by due process, *Gray & Co. v. Firstenberg Mach*. Co., 913 F.2d 758, 760 (9th Cir. 1990) (citing ORCP 4L; and *Oregon ex rel. Hydraulic Servocontrols Corp. v. Dale*, 294 Or. 381, 657 P.2d 211 (1982)), the court may proceed directly to the federal due process analysis, *see Harris Rutsky &*

*Co. Ins. Servs. v. Bell & Clements Ltd*., 328 F.3d 1122, 1129 (9th Cir. 2003) (when state long-arm statute reaches as far as the Due Process Clause, the  court need only analyze whether the exercise of jurisdiction complies with due process); *see also Millennium Enters., Inc. v. Millennium Music, LP*, 33 F. Supp. 2d 907, 909 (D. Or. 1999) (because Oregon's catch-all jurisdictional rule confers personal jurisdiction coextensive with due process, the analysis collapses into a single framework and the court proceeds under federal due process standards).

To comport with due process, "the nonresident generally must have 'certain minimum contacts [with the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)).  The forum state may exercise either general or specific jurisdiction over a non-resident defendant.  *Boschetto*, 539 F.3d at 1016.

## DISCUSSION

Defendant argues that this Court lacks personal jurisdiction over Defendants "because none of the Defendants have the kind of systematic contacts with Oregon that would render the exercise of personal jurisdiction reasonable." Def. Mot. Dismiss 4. Plaintiff has the burden of making a prima facie showing of personal jurisdiction. *Boschetto*, 539 F.3d at 1015. "[U]ncontroverted allegations in [the plaintiff's] complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in [the plaintiff's] favor." *Rio Props., Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1019 (9th Cir. 2002). "[A]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to

testify on the matters stated." *Mulato v. Wells Fargo Bank, N.A.,* 76 F. Supp. 3d 929, 946 (N.D. Cal. 2014).

A court has specific jurisdiction where "the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities."[2] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal quotation marks and citations omitted). The Ninth Circuit uses a three-part test to determine if a party has sufficient minimum contacts to be subject to specific personal jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015) (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)). The plaintiff bears the burden on the first two parts of the test. *Id.* If the plaintiff succeeds, "the burden shifts to the defendant to 'set forth a "compelling case" that the exercise of jurisdiction would not be reasonable.'" *Id.* at 1212 (quoting *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076 (9th Cir. 2011)).

The first prong of the Ninth Circuit's test to establish specific jurisdiction can be satisfied in two ways: either the non-resident defendant must purposefully direct his activities at the forum state, or the defendant must purposefully avail himself of the privilege of conducting activities in the forum. *Picot*, 780 F.3d at 1212. Purposeful availment is most often applied to contract

---

[2] Plaintiff does not appear to argue that Defendant is subject to the Court's general jurisdiction.

claims, while purposeful direction is most often applied to tort claims. *Id.* (citing *Schwarzenegger*, 374 F.3d at 802). Here, Plaintiff brings both.

### A. Purposeful Availment

The "purposeful availment" analysis asks "whether a defendant has 'purposefully availed himself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Picot,* 780 F.3d at 1212 (quoting *Schwarzenegger*, 374 F.3d at 802) (brackets omitted). The "[p]urposeful availment analysis examines whether the defendant's contacts with the forum are attributable to his own actions or are solely the actions of the plaintiff." *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1195 (9th Cir. 1988). "In order to have purposefully availed oneself of conducting activities in the forum, the defendant must have performed some type of affirmative conduct which allows or promotes the transaction of business with the forum state." *Id.*; *see also Walden*, 571 U.S. at 284 (quoting *Burger King*, 471 U.S. at 475) (noting that the relationship with the forum "must arise out of contacts that the 'defendant *himself*' creates with the forum") (emphasis in original).

"A showing that a defendant purposefully availed himself of the privilege of doing business in a forum state typically consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there." *Schwarzenegger*, 374 F.3d at 802. Courts should also consider "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Burger King,* 471 U.S. at 479.

In *Picot v. Weston*, the defendant—a resident of Michigan—entered into an oral agreement with the plaintiffs—residents of California and Nevada—to develop an electrolyte formula for use in hydrogen fuel cells. 780 F.3d at 1209. The defendant was obligated under the disputed agreement to "develop the technology, arrange for its testing, and assist in fund-raising

and marketing." *Id.* at 1212. The agreement was formed in Michigan, and it was understood that

the majority of the defendant's performance of the contract would occur in Michigan. *Id.* In

exchange for his performance, the defendant received one-third interest in profits from the sale

of the technology, $20,000 per month, and reimbursement for expenses. *Id.* After the defendant

did not receive his share of the proceeds from a sale of their technology, the defendant threatened

to sue. *Id.* at 1210. As a result, the buyer stopped paying the plaintiffs. *Id.* The plaintiffs then

filed a suit in California seeking a declaration that no agreement existed between the parties and

damages for intentional interference with the sales contract. *Id.*

   With regard to the plaintiffs' claim for declaratory relief, the Ninth Circuit concluded that

the plaintiffs had not demonstrated that the defendant had sufficient contacts with California to

subject him to specific personal jurisdiction in California. *Id.* at 1212. First, the court found that

the plaintiffs' fulfillment of their contractual obligations in California—i.e. seeking out investors

and buyers in California—did not create a substantial connection between the defendant and the

forum. *Id.* at 1212–13. The court held that "[t]he fact that a contract envisions one party

discharging his obligations in the forum state cannot, standing alone, justify the exercise of

jurisdiction over another party to the contract." *Id.* at 1213. Second, the court indicated that the

defendant's two trips to California were not "meaningful enough to create a substantial

connection with the forum state." *Id.* at 1213 (internal quotations omitted). It emphasized that

"[n]either trip was envisioned in the initial oral agreement" but instead "grew incidentally out of

broader efforts to develop and market the technology." *Id.* Both two-week trips were made at the

plaintiffs' request and expense, and the defendant's role in the joint presentations was limited to

preparing prototypes and demonstrations. *Id.* And neither trip held a "special place in his

performance under the agreement as a whole." *Id.* The bulk of the defendant's efforts in

developing and marketing the technology, the court noted, were centered in Michigan, where he worked and met with possible purchasers. *Id.* Further, the plaintiffs and the buyer all travelled to Michigan to meet with the defendant. *Id.* Thus, the court concluded that "[a]t most, [the defendant's] contacts with California were merely random, fortuitous, or attenuated." *Id.* (quotations omitted).

In this case, the Court finds that Defendant has not purposefully availed itself of the privilege of conducting activities within Oregon. Defendant's contacts with Oregon are limited. Defendant may have instigated the relationship with Plaintiff when it invited Dr. Ray to speak at CMSV. Ultimately, however, Mr. Morgan suggested that the parties explore program opportunities by meeting face-to-face in New York. Dr. Nagi visited Portland twice during their relationship to discuss the program, but both trips were at Plaintiff's request. Plaintiff paid for Dr. Nagi's flights and accommodation for the first trip, and Mr. Morgan invited Dr. Nagi to stay at his home during the second trip. Several students from Oregon participated in the IDS Program, but there is only evidence that Defendant reached out personally to two of these students knowing of their connection to Oregon. The parties also exchanged emails and phone calls regarding the program, but there is no information about where the various contracts involved in this case were negotiated.

The parties' relationship was otherwise centered in New York. Mr. Morgan offered to visit New York to discuss the possibility of collaborating in 2011. The parties worked together to prepare an application for their graduate program for the New York State Educational Department. Defendant provided Plaintiff with an East Coast office, sometimes referred to as its "East Coast headquarters," where Plaintiff maintained one or two employees for operations related to Plaintiff's partnership with Defendant and recruited students from other East Coast

schools. Plaintiff maintained an apartment in Manhattan for, among other things, the use of its employees while they were working in New York. The focus of the parties' contractual relationship was to offer study abroad programs to CMSV undergraduates and to create a graduate service-learning program at CMSV. Defendant's performance under the contract primarily centered around administrative and logistical activities to be carried out in New York, including providing a Master's of Science in International Development, recruiting students on campus and through partner campus networks, billing students, complying with internal CMSV procedures and policies, and creating and supporting partnerships to grow the IDS Program.

In other words, though Defendant had some contacts with Plaintiff and Oregon, the parties' contractual relationship was focused elsewhere. Like in *Picot,* Plaintiff's performance of some of its contractual obligations in Oregon does not create a substantial connection between Defendant and the forum. Nor do the parties' email and telephone communications, standing alone, create a substantial connection with Oregon. *See Siskiyou Properties, LLC v. Bennett Holdings, LC*, 13 F. App'x 553, 556 (9th Cir. June 25, 2001) ("[T]elephone and mail contacts alone have been held to be insufficient to satisfy the purposeful availment test."). Though the relationship may have started when Defendant reached out to Dr. Ray, it was Plaintiff who travelled to New York to explore the possibility of collaboration and maintained both an office and lodging in New York for Plaintiff's employees. In addition, most of Defendant's actions in performing and breaching the contract took place in New York or were directed abroad, and Defendant's two trips to Oregon and communications with two students in Oregon appear to be incidental to the parties' broader efforts to develop and market a study abroad program for the New York-based college. Indeed, the contract envisions Plaintiff—not Defendant—taking primary responsibility for pre-admission recruiting and advertising efforts, and Defendant was

only responsible for doing so through its own "on-campus and partner networks." Morgan Decl. Ex. B. Thus, none of these acts held a "special place in [Defendant's] performance under the agreement as a whole." *Picot*, 780 F.3d at 1213. Accordingly, this Court concludes that—with regard to the specific claims at issue here—Defendant's contacts with Oregon were random, fortuitous, or attenuated, and Defendant did not purposefully avail itself of conducting activities in Oregon.

### B. Purposeful Direction

When evaluating whether a defendant has purposefully directed his activities at the forum state, courts in the Ninth Circuit use the *Calder* effects test. *See Schwarzenegger*, 374 F.3d at 803. In *Calder,* the Supreme Court held that a foreign act that is both aimed at, and an has effect in, the forum state is expressly aimed at the forum: "An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause injury in California." *Calder v. Jones*, 465 U.S. 783, 789–90 (1984). The Ninth Circuit has indicated, however, that *Calder* does not stand for the broad proposition that a foreign act with effects that are foreseeable in the forum state always gives rise to specific jurisdiction. *See Panavision Int'l, L.P. v. Toeppen*, 141 F3d 1316, 1322 (9th Cir. 1998); *see also Axiom Foods Inc. v. Acerchem International, Inc.*, 874 F.3d 1064, 1070 (9th Cir. 2017) (While "individualized targeting . . . remain[s] relevant to the minimum contacts inquiry, it will not, on its own, support an exercise of specific jurisdiction[.]"). Under the effects test, the plaintiff must show the defendant has: "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm the defendant knows is likely to be suffered in the forum state." *Schwarzenegger*, 374 F.3d at 803.

There is no dispute that the three claims—defamation, conversion, and tortious interference—involve intentional acts. *See Picot*, 780 F.3d at 1214 ("The meaning of the term 'intentional act' in our jurisdictional analysis is essentially the same as in the context of intentional torts; namely, the defendant must act with the intent to perform an actual, physical act in the real world." (quotations omitted)). Nor, based on the record, can Defendant reasonably dispute that it knew that the alleged harm was likely to be suffered in Oregon, where Plaintiff is located. Accordingly, the dispositive question in this case is whether Defendant's tortious conduct was "expressly aimed" at Oregon.

The exact form of the Court's express aiming "analysis varies from case to case and 'depends, to a significant degree, on the specific type of tort or other wrongful conduct at issue.'" *Picot*, 780 F.3d at 1214 (quoting *Schwarzenegger*, 374 F.3d at 807). For example, in *Picot*, the court determined that it did not have jurisdiction over the defendant regarding the claim for tortious interference with a sales contract. 780 F.3d at 1214. The circuit court found that the defendant's allegedly tortious acts did not connect him with California "in a way sufficient to support the assertion of personal jurisdiction over him." *Id.* at 1215. The defendant allegedly made statements from Michigan to an Ohio resident that caused a Delaware corporation with Ohio offices to stop making payments to trusts located in Wyoming and Australia. *Id.* His tortious conduct was not directed at California. *Id.* And the plaintiff's injury, "an inability to access out-of-state funds," was "entirely personal to him and would follow him wherever he might choose to live and travel." *Id.* In other words, "[t]he effects of [the defendant's] actions [were] . . . not connected to the forum State in a way that makes those effects a proper basis for jurisdiction." *Id.*

Here, like in *Picot*, Defendant's alleged tortious conduct was not aimed at Oregon, and any injury Plaintiff suffered in Oregon is insufficient, standing alone, for the Court to exercise jurisdiction over Defendant. First, Plaintiff alleges that Defendant converted the property of IPSL to its own use. The conversion of this intangible property—which includes site information, programmatic content, and other workshops that IPSL had previously conducted for students participating in their program—likely took place in New York where Defendant engaged in conduct interfering with Plaintiff's right to possession.

Second, Plaintiff alleges that Defendant tortiously interfered with its business by demanding information from Plaintiff, eliminating study abroad options, communicating with its students, and changing the services rendered by IPSL to CMSV students. In other words, Plaintiff alleges that Defendant interfered with Plaintiff's relationship with CMSV students, who were presumably either in New York or abroad. There is no allegation or evidence that this interference was directed at the forum. [3]

Third, Plaintiff alleges that Defendant defamed Plaintiff in three separate statements made to students and "others." Again, there is no evidence or allegation to suggest these allegedly defamatory statements were directed at Oregon or anyone in Oregon other than Plaintiff.

Further, Plaintiff's injury—the loss of revenue and other damages associated with the end of its relationship with Defendant—would follow Plaintiff wherever it chose to operate. And other effects of the alleged tortious conduct, such as the loss of CMSV students, are not tied to Oregon. Accordingly, the Court finds that Plaintiff has not demonstrated that Defendant

---

[3] Though Defendant did seek out two students in Oregon, there is no evidence that these students—who were contacted by Dr. Nagi in 2014—were involved in this claim for tortious interference, which took place three years later when Defendant allegedly breached the parties' agreement.

*expressly aimed* its conduct at the forum state. The alleged tortious acts were largely undertaken in New York or directed at individuals in New York and abroad.

In sum, Plaintiff has failed to make a prima facie showing of specific personal jurisdiction over Defendant. Defendant "neither purposefully availed himself of the privilege of conducting activities in" Oregon "nor expressly aimed [its] conduct" at Oregon. *Picot*, 780 F.3d at 1215. Because Plaintiff has failed to meet its burden on the first prong of the analysis, the Court need not proceed to the second and third prongs. *Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008) ("[I]f the plaintiff fails at the first step, the jurisdictional inquiry ends and the case must be dismissed."). Accordingly, this action is dismissed for lack of personal jurisdiction.

## CONCLUSION

The Court GRANTS Defendant's Motion to Dismiss for Lack of Jurisdiction [9]. Accordingly, this case is dismissed for lack of personal jurisdiction but without prejudice to allow Plaintiff to bring his claims against Defendant in a court of competent jurisdiction.

IT IS SO ORDERED.

Dated this ____21____ day of ____May____, 2019.


_____
MARCO A. HERNÁNDEZ
United States District Judge